E. W. JONES AND WIFE v. JOHN WILLIAMS ET AL.

1. MILITARY ORDERS ADMISSIBLE IN EVIDENCE WITHOUT SHOWING THE LAWS OR ORDERS AUTHORIZING THEM.—The military orders of a Confederate general in command of a department, issued during the late war, when offered by one who seeks to establish under them his authority at the time to act, are admissible in evidence as original documents, without affidavit of loss and search for the law or superior order authorizing their issuance.

2. WHEN A MILITARY ORDER AFFORDS PROTECTION TO THOSE WHO OBEY IT.—All officers and agents of the Confederate Government who, during the late war, acted under and by virtue of instructions from the department commander, issued under existing authority, are protected by such instructions from personal accountability.

3. WHEN AN ILLEGAL CONTRACT CANNOT BE RELIEVED AGAINST.— Where an illegal contract has been fully executed, the courts will not interfere in aid of a party to such contract who may have been injured thereby.

4. NEW TRIAL.—Where there is evidence sufficient to support the verdict in cases of conflicting testimony a new trial will be refused.

APPEAL from Cherokee. Tried below before the Hon. M. Priest.

This suit was originally begun by J. P. Douglass, as guardian for F. M. Thompson, who was alleged to have been *non compos mentis*, and of Fannie Marshall, a minor. During the pendency of the suit F. M. Thompson died, and Fannie Marshall married E. W. Jones, after which the suit was prosecuted in the name of E. W. Jones and his wife, who thus became sole claimants.

The suit was for the recovery of twenty thousand dollars, the alleged value of sixty-four bales of cotton charged to have been fraudulently taken from F. M. Thompson and converted by defendants in the year 1864.

The defendant, Williams, in his answer alleged that on the 11th day of December, 1863, and during the year 1864, he was the duly-appointed and acting agent of the late Confederate Government for the purchase of cotton; that his authority extended to the purchase for said Government of one half the cotton in said county, to pay for the same, and give indemnity to the owner that the remaining half should not afterwards be impressed by the Government; that on, to wit, the —— day of ——, 1864, in pursuance and accordance with his said authority, and the instructions from his superior officer in command, he purchased of said F. M. Thompson, *both being citizens of said Confederate Government*, said sixty-four bales of cotton, the same being then and there in the actual possession, control, management, and apparent ownership of the said Thompson, and claimed by him; that afterwards, to wit, on the 11th day of May, 1864, he and the said Thompson weighed, marked, designated, and set apart said cotton to said defendant as such agent for the use and benefit of said Government; that said defendant then and there fully paid the said Thompson for said cotton the price agreed upon between them, which was accepted and received by him in full satisfaction thereof, whereupon the said Thompson made,

executed, and delivered his bill of sale of the same, which was made a part of amended answer, and the said defendant Williams gave him, on behalf of said Government, an obligation or indemnity protecting the remainder of said cotton from impressment; that the cotton so purchased was left in charge of said Thompson, and defendant Williams having reported his action to his superior officer, the cotton was thereby, so far as he was concerned, turned over to said Government; that said cotton was afterwards taken away by a train of wagons and converted by said Government to its own use and benefit; that at the time said cotton was so actually taken away he had turned it over to his said superior officer as aforesaid, and had, in fact, nothing further to do with it, and positively refused to take control over it; that the only authority or control he ever had or exercised over said cotton was strictly as such Government agent, and that he never had or received any of the proceeds of the same whatever.

It may be here remarked that the evidence fully sustained every allegation in the answer of defendant Williams.

Defendant Barrett adopted substantially the answer of his co-defendant Williams, pleading that he was also a cotton agent of said Government, and whatever he did in ordering the removal of said cotton was done as such agent. Defendant Hall answered by general denial and general demurrer. Defendant Hamilton having failed to make any appearance, judgment by default with a writ of inquiry was taken against him.

The plaintiff demurred to the answer of Williams and Barrett generally and specially, and alleged that the said laws and orders of the Government of the Confederate States were in violation of the Constitution and laws of the United States, and were null and void, and that hence defendants could not justify under the same. A trial was had at the July term, 1872, which, the demurrer of plaintiffs being overruled, resulted in a verdict and judgment

for defendants, Williams, Barrett, and Hall; and under the charge of the court the damages under the writ of inquiry were assessed, and judgment rendered against defendant Hamilton for $7,488. Motion for a new trial overruled, and appeal taken.

The court gave the jury, among other instructions, the following, viz: " Texas, during the civil war, being a part of the territory under the control of the Confederate Government, was subject to said Government, and the citizens of Texas were necessarily bound to obey and comply with the laws of said Government, and with the military orders of E. Kirby Smith, lieutenant general commanding the department; and all officers and agents acting under him, and in accordance with the instructions given them, are protected from personal liability and accountability."

*T. J. Word* and *A. M. Jackson*, for appellants, cited Whitmore *v.* Allen, 33 Tex., 355 ; The Sequestration Cases, 30 Tex., 700, *et seq. ;* Hickman *v.* Jones, 9 Wallace, 200; Bayliss *v.* Estes, 1 Heiskel, 78; Wiley *v.* Wiley, 33 Tex., 358.

*Bonner & Bonner*, for appellees, cited George *v.* Stevens, 31 Tex., 675; Thorington *v.* Smith, 8 Wallace, 1; Vattel, book 3, chap. 28, p. 426 ; The Prize Cases, 2 Black, 668, 669; Trevino *v.* Fernandez, 13 Tex., 630 ; United States *v.* Palmer, 3 Wheaton, 610 ; The Divina Pastora, 4 Wheaton, 52; The Santissima Trinidad, 7 Wheaton, 283; Price *v.* Poynter, 1 Bush., 387; Bell *v.* L. & N. R. R. Co., 1 Bush, 404; Brakebill *v.* Leonard, 40 Ga., 60; 1 Greenl. Ev., § 82; Latham *v.* Selkirk, 11 Tex., 321; Brashear *v.* Martin, 25 Tex., 202; Jackson *v.* Van Dusen, 5 Johns. 157; Burton *v.* Bondies, 2 Tex., 203; Horton *v.* Reynolds, 8 Tex., 284 ; Parker *v.* Leman, 10 Tex., 116.

DEVINE, ASSOCIATE JUSTICE.—This suit was commenced in the name of J. P. Douglass, as guardian of Francis M.

Thompson and Fannie Marshall, in the District Court of Cherokee county, on the 10th day of October, 1865, to recover the value of sixty-four bales of cotton, owned jointly by said Thompson and Marshall. The petition averred that Thompson became of unsound mind about the 1st of March, 1864, and has so continued; that on or about September 30, 1864, Thompson, after due proceedings before a competent tribunal in Cherokee county, was found, and so declared, of unsound mind, and that in October, 1864, petitioner was appointed guardian of Thompson and of the minor, Fannie Marshall.

The petition charged that the defendants, John Williams, Wm. W. Barrett, A. J. Hamilton, and Robert Hall, fraudulently combining to defraud the plaintiffs of their property, did, after Thompson became of unsound mind, and on or about the 30th of June, 1864, and down to October of the same year, take, without any legal right, sixty-four bales of said cotton, each bale being averred to be worth three hundred dollars, by reason of which plaintiffs were damaged to the amount of twenty thousand dollars. The petition contains the usual prayer for damages, &c., &c.

The defendant, Williams, excepted generally and in special terms to the petition, and answered with a general denial, and averred that from the 11th of December, 1863, and during the year 1864, he was acting in Cherokee county as the agent of the Confederate States for the purchase of cotton, and as such agent purchased the same; that in the purchase of said cotton he acted within the scope of the authority vested in him by his superior officers, duly authorized to act as the officers of said Government, which was then the only existing *de facto* Government of Texas and other States; that Francis M. Thompson and defendants were both citizens of said Government; that Thompson had the sole control and management of the cotton, and was the only known owner of the same.

Defendant further averred that in 1864 he purchased for

a valuable consideration the 64 bales of cotton mentioned in plaintiffs' petition, which Thompson had consented to sell, and did sell to defendant, as agent of the Confederate States, and "that afterwards, on the 11th of May, 1864, said 64 bales of cotton were by said Francis M. Thompson and defendant weighed, marked, designated, and set apart to defendant as such agent;" that defendant fully paid then and there the price agreed upon for said cotton; that defendant then gave to said Thompson the written guaranty which he was authorized to give, protecting the remaining half of 64 bales of plaintiffs' cotton from impressment, seizure, or molestation; that the money and guaranty then received by Thompson were accepted freely by him as full satisfaction for the cotton so purchased. There were other defenses by Williams not necessary to be noticed.

The defendant Barrett answered, adopting the exceptions and answers of his co-defendant Williams, and averred that his action in ordering the removal of the cotton was in obedience to the obligations imposed upon him as an officer of the cotton bureau.

The defendant, Robert Hall, excepted generally, and answered with a general denial.

A. J. Hamilton made default, and a judgment interlocutory was entered against him, and a writ of inquiry demanded.

The minor, Fannie Marshall, having intermarried with William E. Jones, and the interest of Francis M. Thompson having, after his death, vested in his widow, and by virtue of the will of William J. Thompson, her husband, William E. Jones, and herself were substituted as plaintiffs; and after various amendments by plaintiffs and defendants, which were in substance repetitions of their previous pleadings, the cause was tried and a verdict rendered by the jury in favor of the defendants, Williams, Barrett, and Hall. A verdict under the charge of the court for the

value of the 64 bales was found by the jury against A. J. Hamilton, who had not answered.

The plaintiffs moved for a new trial, and assigned as grounds for the same: 1st. "Because the court erred in permitting the depositions of Guy M. Bryan and William J. Hutchins to be read in evidence. 2d. Because the court erred in the instructions given to the jury. 3d. Because the finding of the jury is contrary to the law and the evidence."

The motion for a new trial being overruled, the plaintiffs appealed, and assign as errors the following:

"First. The court erred in overruling the motion for a new trial, and in refusing to grant a new trial.

"Second. That the court erred in giving a judgment on the verdict found by the jury, the said verdict being vague, uncertain, and contradictory.

" Third. That the court erred in instructions given to the jury.

"Fourth. That the jury found their verdict contradictory to law and against the evidence submitted to them, and is wholly unwarranted."

The first assignment of error being embraced in the grounds set forth in the 2d, 3d and 4th assignments, will not be now noticed further than by remarking that the exceptions taken by plaintiffs to the admission of the depositions of Guy M. Bryan and William J. Hutchins, and assigned as one of the grounds for a new trial, are not tenable. The depositions, whatever may be urged as to their not furnishing evidence sufficient as a defense to the action, were clearly admissible as evidence and for what they might legally be worth. The objections raised to the admission as evidence of the "general orders" issued by Guy M. Bryan as the assistant adjutant general of General Smith, and by the direction of that officer, and the order creating the cotton office for Texas, New Mexico, Arizona, and the order assigning William J. Hutchins to

duty as chief of that office or bureau, and attached to their depositions, were original documents, and as such were admissible in evidence without declaration or proof of loss and search for the law or order authorizing them. The second assignment of error, relative to the vague and uncertain character of the verdict, and its omission to define the facts found, and its being contradictory, is not apparent from an examination of the verdict. The jury find for the defendants. In this verdict there is nothing vague, uncertain, or indefinite: it is as clear, as certain, and as positive as could be expected or desired in any suit of this character. It is not contradictory by reason of its likewise finding the value of the cotton taken: this was called for in that portion of the charge of the court which directed the jury to find the value, as the basis of a judgment against the defendant A. J. Hamilton, who had not answered, and against whom a judgment by default had been previously taken.

"The third assignment of error, that the court erred in instructions given to the jury," is, we believe, not sustained by even the most critical examination of the charge, so far as the plaintiffs may be interested in it. The charge is a remarkably clear statement of the case, presenting it to the jury under various aspects, comprehensive in its views of the rights and obligations of the defendants, the condition of mind in which F. M. Thompson was, and the character of the transaction relative to the alleged purchase of the cotton from him by Williams. It left nothing for the plaintiffs to object to. If there is any error in the charge, it will be found in that portion relative to the time at which the value of the cotton was to be ascertained, and of this the defendants only could complain. No exceptions to the charge were made, neither were any instructions asked for by plaintiffs. They were satisfied with the charge when it was delivered to the jury.

The fourth assignment of error, "that the jury found

their verdict contradictory to law and against the evidence submitted to them, and is wholly unwarranted," fails to show, when tested by an examination of the pleadings, the evidence, and charge of the court, any error. The charge in plaintiffs' pleadings of fraud and combination on the part of Williams and the other defendants is not supported by evidence. It is, in fact, completely negatived by the evidence.

The claim of appellants to recover, on the ground that Fannie Marshall (now Mrs. Jones) was the owner of one-half of the cotton, by virtue of the will of her deceased uncle, William J. Thompson, and as such could not be divested of her interest by the action of Francis M. Thompson, is answered by reference to that will, which appoints her uncle, Francis M. Thompson, " trustee for my said niece, Fannie Marshall, to receive, hold, manage, and control all the property she may become entitled to under or by this will, until she arrives at full age of twenty-one years old, paying over to her annually such portion of the annual profit or income as she may need for her maintenance or support." This portion of the will gave him full power to manage, control, and use the property for her benefit or support.

It is argued in the brief of appellant's counsel that F. M. Thompson had not qualified under the will as executor, neither had he accepted the appointment of trustee for his niece. The will was proven up on behalf of Fannie Marshall in the State of Alabama, and admitted to probate on the 10th of March, 1864, in the county of Macon, in that State. It was not necessary that Francis M. Thompson should have qualified as executor to enable him to become entitled to the property devised to him by his brother. He was already in the exclusive possession, use, and enjoyment of it. Neither was a formal acceptance of the trust conferred upon him for the benefit of his niece necessary. The evidence shows that he alone held the posses-

sion, and had the exclusive control of the property jointly owned by himself and niece under the will, she being at the time a resident of Alabama. He held it under the will in trust for her, and as her trustee was liable for the same. It was disposed of by him as his own property, neither Williams nor the other defendants having the slightest knowledge of Fannie Marshall having any interest in the same. Independent of these facts, the evidence shows that after the sale of the sixty-four bales to Williams there still remained an equal number of bales and weight of cotton, equal in all respects to that sold; and even conceding that Thompson could only dispose of one-half, the amount to which Fannie Marshall was entitled under the will still remained in the custody and control of Thompson.

It is, however, earnestly contended, on behalf of appellants, that as Fannie Marshall would be entitled under the will to all the property devised to Francis M. Thompson, in the event of his dying and leaving no child or children, this property could not be sold or disposed of by Thompson, and that upon his death, about three years after the sale of this cotton, she was entitled to claim the property, (he having left no child,) or, as in the present suit, recover the proceeds of property from those who might have purchased it years before. While this view would be correct so far as the real estate was concerned, if sold by him, or so far as the personal property remaining at his death and capable of identification went, it certainly cannot be held with reference to ordinary sales of personal property in the usual course of business, or the sale of the crops of the plantation in Robinson county, and the one-half of the annual crops of the plantation in Cherokee county. The will under which she claims affords nothing to support such a view of her rights or his responsibilities; and this brings us to the principal or main question in the case, which is, Was Francis M. Thompson of sufficient mental capacity to contract with John Williams at

the time stated in the evidence, or was he capable at the time of understanding the character and terms of the contract, and did he give an intelligent consent to the execution of the same by his agent, Doctor Simmons?

On the trial of this cause, stress was laid on the fact that defendants were acting as the agents of the Confederate States Government. It is not necessary for the decision of this case to inquire what measure of protection should and can be legally extended for the protection of an officer acting as an officer or agent of that Government, and acting within the scope of the authority conferred upon him. As already stated, another and entirely different question is presented as the principal one, and to which all others are necessarily subordinate. The able brief of appellants' counsel, however, relies upon the case of Whitmore *v.* Allen, 33 Tex., 355, as of controlling influence in this, and as a decision which applies with peculiar force to the facts and circumstances connected with or growing out of the transaction complained of by plaintiffs. The case cited furnishes but little information. Whitmore sued Allen and eight others, in 1866, to recover damages for false imprisonment from November, 1863, to November, 1864. The jury rendered a verdict of not guilty, and on appeal the judgment of the District Court was reversed. There is nothing in the statement of the case by the reporter or in the opinion of the court to show by what authority or on what charge Whitmore was seized and imprisoned in Smith and Cherokee counties for the term of one year. Beyond that portion of the opinion of the court which states that " the appellees appear to have acted as an independent organization of cavalry, under authority of the Confederate States," it is not perceived in what manner the case referred to can be considered as having application to the case before us.

It is contended, on behalf of appellants, that this being trust property, even were it an executed contract, Fannie

Marshall's interest cannot be affected by what is contended to have been an illegal transaction. It is not, however, shown to have been her property. As already stated, sufficient remained to satisfy her interest, were it admitted that Thompson could not control the entire crop of one hundred and twenty-eight bales; and the rule which governs is the familiar one declared in Whitis *v.* Polk, 36 Tex., 626: "When an illegal contract has been fully executed, the courts will not interfere to litigate the claims of parties who may have been enjoined thereby."

As regards the condition of F. M. Thompson at the time of the sale of his cotton to defendant, Williams, the evidence is conflicting. The evidence of J. P. Douglass, the original plaintiff, and P. Blackburn and wife, both in the employ of Thompson, detail facts and state their opinions, and the facts and opinions stated by these witnesses tend strongly to show the incapacity of Thompson, before and at the time of the execution of the contract, to make the same—Douglass stating facts that occurred in the spring of 1864, and Blackburn and wife as early as February, 1864. The evidence of Dr. Russell, residing at Larissa, is that he first became acquainted with Thompson at a picnic on the Néches, on the 1st or 15th of May, 1864; that he met him afterwards several times, and once visited him at his (Thompson's) plantation in his professional capacity. The opinion of this witness was that Thompson was incapable of understandingly entering into or consummating the contract. Dr. Ryan states he "became acquainted with Thompson in the spring of 1864, and down to the winter of 1866, and attended him professionally in the latter part of 1866; that he was then consumptive, very much paralyzed on one side, affecting his articulation materially, and very much impairing his mind; thinks his condition gradually grew worse, and does not think he was in a condition to do business accurately during the time witness knew him."

It will be observed that the attendance of this witness, in his professional capacity, was over two years and a half after the date of the contract with Williams.    On behalf of defendants it was shown by the evidence of Dr. Simmons that he was personally acquainted with F. M. Thompson from boyhood; that they had always been intimate, being, as it were, raised together; witness resided with Thompson a few miles from Larissa, in Cherokee county.    Witness further stated that in February, 1864, Thompson came home from a visit to Larissa " and stated to witness that he had seen the agent of the Confederate States Government, Mr. John Williams, who was proposing to ·purchase cotton for said Government, and that he would have to let the Government have one-half of his cotton," and made the impression on witness that he believed it would be for his interest so to do.    " Mr. Thompson was then in good health, and perfectly at himself."    About two months after this, Williams came to Thompson's and conferred with Thompson relative to the purchase.    Thompson was not then in good health, but was sitting up. Williams, in reply to the questions of witness, stated he proposed to purchase one-half of the cotton at the Government price, and give the party so selling in addition a guaranty against any impressment of the other half by the Government.    Witness was at this time attending to Thompson's business, and stated to Williams he would acceed to his proposition, and would do so the more readily as Thompson had, when in good health, spoken to him on that subject.    Before closing the contract with Williams, witness consulted with Thompson, and asked him if he remembered the conversation on the subject of the purchase of the cotton on his (Thompson's) return from Lavissa some time before.    Thompson stated he did.    Witness then asked him if it was still his intention to let the Government have one-half of his cotton, and he said it was; witness then closed the trade with Williams.    About four

or five days after this, Williams came to Thompson's; the sixty-four bales were weighed and marked; he then paid the price agreed on, took a descriptive receipt signed by witness as the agent of Thompson, and gave to Thompson a guaranty on behalf of the Government against the impressment of the remaining half. The receipt was put in evidence. This witness, who was with Thompson at his residence before, at, and after the sale and payment of the price agreed on, stated, as his professional opinion, that Thomson, when he declared his intention or willingness to sell half of his cotton to Williams, in February, 1864, on his return from the town of Lavissa, was of sound mind. At the date of the receipt and weighing of the cotton, May 11, 1864, witness states that Thompson, although considerably paralyzed on one side, was fully capable of transacting the business; that it was fully explained to Thompson by witness, and fully comprehended by him, and, from witness' knowledge of and long and close intimacy with Thompson, he is satisfied he fully comprehended the nature of the transaction. This witness retained the money paid, nearly eight thousand dollars, until the appointment of J. P. Douglass as guardian, in October, 1864, and then delivered it to him. It was shown by other witnesses that other persons in Cherokee county sold half their cotton to Williams on the same conditions and for about the same price.

All the facts in this case show that the contract of Thompson was of the same character as others in that county; that it was consummated in the middle of May, 1864. Although there is a preponderance of numbers, as regards the witnesses, who testified as to his insanity at and before that time, the evidence of Doctors Russell and Ryan show that the former visited him but once in his professional character. The other was not called to visit Thompson professionally until over two years and a half after the execution of the contract or sale of the cotton.

Doctor Simmons resided with him on his plantation, knew him long and intimately, acted as his agent, friend, and physician before, at, and after the date of the contract. Neither this nor any other court is competent to establish a system of weights or measures by which it can be positively determined how much credit should or can be given to the testimony of witnesses who are not before it, when the evidence of such witnesses is contradictory or conflicting. The law has confided this power principally to the jury, who see the witnesses, and whose opportunities for correct observation in this respect are greatly superior to the members of an appellate tribunal. The duty of the jury to reconcile the conflicting or contradictory evidence of the witnesses, or to give a greater degree of credit to one or more witnesses than to others, seems to have been exercised in this case not unreasonably. And the character of the contract, as shown by the evidence, it being such as any sane person might at that time be reasonably expected to make under like circumstances, relieved it from any taint of fraud or suspicion of unfairness. There being evidence sufficient to support the verdict, there was no error in refusing the motion of appellants for a new trial, and the judgment is affirmed.

AFFIRMED.